Mr. Burge, good afternoon. Did I get Taluri correct? You did not, but you pronounced it the same way I would have as well. It's actually Tallery. Tallery. Okay, take it away. Thank you very much, Your Honors. Jason Burge, here on behalf of Raja and Gayatri Tallery. This is a bad faith insurance case, and I'll start by noting it's a little bit of an odd presentation. I think it's more common that a bad faith insurance case comes up in the context that there's still a dispute over the amount to be paid. Here, there was no dispute that AIG ultimately paid all amounts that were due under the policy. There's also no dispute that AIG waited more than 30 days to pay a $6.6 million demand. In fact, they waited almost 90 days to invoke appraisal, and they waited almost a year before they ultimately paid on that demand. So there was a three-day jury trial here, and the issue in that trial was that pre-appraisal, there was about a $5.5 million delta between the demand made by the Talleries and the amounts that had been paid by AIG. And about 40 days went by between when that last payment was made, at which point AIG had done its inspections, they'd talked to their engineer, and when they demanded appraisal. And at the trial, the trial court kept from the jury the most critical information in the case. When that appraisal came back, it awarded $16 million. That was two and a half times the public adjuster demand, and 13 times what AIG had paid at the time they requested appraisal. The trial court also limited the testimony of the Talleries appraiser, who said that when he went out and looked, he found $20 million worth of damages. Now, multiple cases, and we cited the Juncker case and the roofing and reconstruction contractors case, have held that this exact type of evidence, the delta between the amounts paid before appraisal and the final award, is material evidence to prove bad faith adjustment. Courts have held that this fact alone can defeat motion for summary judgment. And so I'd submit, Your Honor, it's plainly relevant evidence that should be considered by a jury in considering whether AIG's payments prior to appraisal were a reasonable adjustment of this claim. And to see why it was both prejudicial to the Talleries and would not be unfairly prejudicial to put it in, that it had a substantial impact on the jury, I think you need look no further than the first lines of the defense's closing argument here. They were, quote, some people are never satisfied. By our estimate, the Talleries have been paid five and a half times what we estimate the damage to their house is. $6.7 million they've been paid to date, all they claim caused by Hurricane Ida. Now, to start with, that statement to the jury is just literally false. But apart from the fact that it's false, the implication of that defense is that these greedy people got paid $5.5 million more than we think they're entitled to. And now they want us to pay even more because we didn't just pay that money when we received their demand before the appraisal. That argument hits very differently if you know that, in fact, they were paid 13 times what you offered before the appraisal. And that AIG refused to pay even a third of what was ultimately awarded, the ultimate amount of this claim, until they put them through a lengthy appraisal process. That is the evidence that was excluded from this trial. And that is why. Well, the closing argument, of course, isn't evidence. Correct, Your Honor. But that was the evidence that we sought to put in that was excluded by both a pretrial motion and limine. And at the trial, we tried to put in the evidence of the value our appraiser had found. And there was a proffer in which we put that forward. It was excluded. But your appraiser did talk about the scope of that disagreement with AIG, right? Correct. He talked about how he saw additional things beyond what was in the ATA appraisal. And it literally – I think the testimony can read that it's not much more than I saw additional things that weren't in that public adjuster appraisal. There's a very big difference between I saw additional things and I think the value of this claim is $14 million more than that prior demand. And that the appraiser by an independent neutral umpire came back and awarded $16 million for this claim. I mean under the terms of the policy, that award is binding. And this court recognized just a couple months ago in the Leesville case, under Louisiana law, when an umpire comes back with an award, that's presumptively the value of the claim. So this jury never got to learn the actual value of this claim when it was expected to determine whether AIG was reasonable in only paying $1.3 million prior to demanding an appraisal. Did you make an objection to this opening statement of the closing argument? Well, to be fair, Your Honor, I was not the trial counsel. Okay. So I wasn't there at the time. You counseled for the plaintiffs. Did you make an objection? They did not, although I'm not sure there would have been a grounds to object because there was no evidence in the record to prove the opposite of what the defense counsel was arguing. The only evidence that was allowed in was that $6.6 million was paid at the end of the appraisal process. We were prevented from putting in the actual amount that was awarded at the end of the appraisal. Well, you could have requested a bench conference and asked the judge to instruct the jury to disregard that comment that you're placing so much emphasis on. That could have happened, Your Honor, although earlier in the trial, a day earlier, we had sought to introduce that same evidence that the judge had refused. So we tried to raise this multiple times. It came up in the motion in Limine and it came up at trial when we sought to put in the evidence. Well, I just find it interesting that you're placing so much emphasis on it when you're agreeing that, you know, it's just you didn't do anything to protect yourself. Well, I think the reason I'm putting emphasis is that I'm relying on that Boca Negra case that this court ruled on back in 2003, which is a similar kind of case. In that case, all evidence was excluded about the fact that the defendant who caused the car accident had used marijuana prior to driving. And in the closing argument, the defense argued this guy did everything he could have reasonably done to try to prevent the accident. And of course, obviously, if you knew the guy was high, you wouldn't be able to argue he did everything he could do to avoid the accident. And there was no evidence there that the plaintiff had objected to that statement that was made in the closing argument or that he had asked for a bench conference. But this court reversed in Boca Negra for a new trial, saying that the fact that this sort of misled the jury and played heavily in the closing arguments was evidence that it had a substantial impact on the trial. So that's what I'm saying here. The facts here as to harmless error are very similar to that Boca Negra case. There is a fact that is just crucial to this analysis here. It was kept from the jury because of these evidentiary decisions. And then the fact that it was kept from the jury was relied on in closing statements by the defense. That shows how important this was to the trial. It speaks to the harmless error. But I agree, Your Honor. It would have been better to have stood up and said, objection, Your Honor. You shouldn't be allowed to say this false thing to the jury in the closing argument. I'll note, you know, we start with the 401-402 analysis here. Louisiana has very strict laws on – 401, 403. Well, 401-402 on relevance and 403 on prejudice. I want to start with the relevance because Louisiana laws, they're pretty straightforward. Insurance company has an obligation to pay all amounts due within 30 days of receipt of satisfactory proofs of loss. If they don't, there's a 50 percent penalty. The courts in Louisiana have been pretty clear. What qualifies as satisfactory proof of loss? There's no formal requirement. Here we do have this ATA demand, the public adjuster demand of $6.6 million, and that kind of set the boundaries for trial. But there's no requirement that there be any demand at all. Insurance – here, this insurance company, AIG, had the opportunity to do a full inspection of the house multiple times. They did one in September of 2021. They did another on October 5th of 2021. They had their engineer and their building consultant out there. They got reports from their engineer, reports from their building consultant. All that came back by the end of December. They made their payment on January 4th based on those reports. So they had a more than adequate opportunity to do a – to get satisfactory proofs of claim, even apart from getting the ATA demand. And yet the amount they paid was one-thirteenth of the final amount. That is a relevant issue that should have been presented to the jury. And I think the key case on this is the Louisiana bag case, the Louisiana Supreme Court that gets cited routinely by this court. It's an old case from 2008, but it really lays out the standards here. And it makes very clear, insurers can't demand mathematical precision as a way to delay payment. They can't, quote, stonewall their insurer by requiring that you don't prove the exact amount due before you pay. The court says when the exact amount of damage is unclear, the insurer must tender the reasonable amount, which is due. And that reasonable amount is the amount by which reasonable minds could not differ. The court goes on. Regardless of any disputed amount in a claim for which even if there is substantial, reasonable, legitimate questions, the insurer must pay any undisputed amounts as to which reasonable minds could not differ. And if you look at the trial here, much of the trial concerned a $2 million distinction about whether the tiles that are going to go on this roof are the same like kind of quality. You see throughout the brief talk about this Luigi tile that somebody had proposed to put on instead of the original mid-grade clay tile. Well, that $2 million distinction, that seems pretty important if you think the total delta in this case is $5.5 million. But if you know the total delta is $15 million, then a $2 million distinction doesn't explain why AIG is still $13 million off the amount that's actually due on this claim. I think under 403, we've cited multiple cases for the kind of the hoary proposition that all evidence is prejudicial to one side or the other. Otherwise, it wouldn't be relevant. The question is whether it's unfairly prejudicial. And I submit there's nothing unfairly prejudicial about letting a jury know what the actual value of a claim is. If they're supposed to determine whether AIG's inspection, whether AIG's appraisal of the damages in the almost six months that passed between when the storm hit and when they finally request that the appraisal process was reasonable. And on harmless error, I cited that Boca Negra case, which I think is really right on point in terms of the importance of this kind of central fact. We also cited the Brazos River case where this court said, yes, we're reluctant to overturn the rulings of a trial judge after a lengthy trial. But nevertheless, relevant evidence which engenders no unfair prejudice and which relates to the core of the dispute should not be summarily excluded. That's exactly what happened here. We have relevant evidence that goes to the core of really any bad faith dispute. And it was excluded by the court here. It was never presented to the jury despite the fact that we tried. On the appraisal process, if we can call it that, where you had the umpire under the terms of the insurance policy, does the insurance policy require that the amount determined by the umpire, that the insurer will pay that amount? I've seen a different provision in one of the cases. What the one here says, and it's in the record at ROA 4038, it says the amount determined by the umpire shall be binding. I think it actually says the amount that's either agreed on between the two appraisers or one appraiser and the umpire shall be binding. And the insurer is the one that can require the appraisal process. And that's what happened here. Right. Can the insurer ask for it? Either side could. Right. But it is agreed that it's binding, meaning that the insurer will pay it if that's what the umpire sets the amount to be. Once it's invoked, yes. And the insurer did, in fact, pay it here. Within how many days? I believe after the appraisal was done. It was, I think, 28 days before they paid. So within the 30 days. Within the 30 days. But there was almost six months before they invoked the appraisal. And I think key here, which distinguishes this case from some of the cases the defendants rely on, like the first United Pentecostal case, there was a 40-day break between all of the initial activity with the engineer, building consultants, and payments, and when they demanded appraisal. And so they're already untimely by the time they demand appraisal because nothing is happening from January 4th to February 16th. And more than 30 days go by. As of January 4th, is that today, January 4th? That was the day of the last payment. Right. As of January 4th, how much had been paid to the insured? 1.3, I think, roughly. 1.3 million. Correct. On a claim that was $16 million. I think it's important to understand the notion of the property we're talking about here. This is a very unique property. We call it a house, but this is a 34,000-square-foot house. It has a 14,000-square-foot bottom floor that contains a ballroom that seats 600 people. They routinely host events for Nicholas State University, for the Thibodeau Regional Center Hospital, political events. These people are running a convention center that they happen to live on the second floor of. So thinking about it in terms of $1.3 million is a lot for your house. This is not a typical house. It has 10 bedrooms, 14 bathrooms. It's full of unique materials that were brought from all over the world, Venetian plaster, onyx floors. But ultimately, the fact that it is a very unique house, that doesn't change the application of these Louisiana standards. They still have 30 days to pay once they have satisfactory proof of loss. And here, they got the opportunity to do inspections in September and October. They got their reports by December, and yet they paid 1.3 for the final amount. That information should have been presented to the jury. Okay. Mr. Burge, we have your argument. Thank you. We'll see you back on rebuttal. We'll hear from counsel for AIG, Michelle. Thank you, Your Honor. May it please the Court, I'm Leigh Ann Schell for AIG. Your Honors, the one thing you did not hear is perhaps the most important thing, and that is the district court judge made his two evidence rulings that we'll hear about today in the context of the summary judgment ruling he had already made pre-trial that has not been appealed. That summary judgment ruling held that the only thing at issue at trial was not the full amount of the appraisal and whether AIG paid that amount on time, but instead whether the difference between the JS-held estimate of about $2.2 million and the ATA estimate of $6.7 million, whether AIG was appropriate in disputing those amounts. So the focus is before the appraisal process. That was what was at issue at trial. The Court had found that a sixth payment made after the appraisal process was in fact made on time by summary judgment. And again, there's no appeal of that. So it's very important when the Court tries to determine whether the district court is correct on relevance rulings, what was at issue at the trial? So the district court found that two pieces of evidence, out of all the evidence, we'll only hear on two complaints, two pieces of evidence. One, the umpire's full award that came seven months after the AIG adjuster was making his decision. And two, Luke Irwin's position, whatever exactly that means, which also came later during the appraisal process and was not in the possession of AIG when it made its determination that there was a reasonable dispute as to the amount. What AIG had was the AT estimate from the plaintiffs, which was 6.7, and it had its own estimates. Again, what we didn't hear is the case that this Court decided on October 17, 2024, a week before the Tulare trial. That decision is First United versus Church Mutual. There are a lot of Church Mutual decisions, but this one was authored by Judge Villette and Judge Duncan, you were on the panel. And the two important holdings in that case are that the pivotal point in time, the relevant point in time is what the adjuster knew when he was making his decisions. That point in time was pre-appraisal. The other ruling that the Court made in Church Mutual was that it is reasonable for an insurer to retain an engineer and to rely on that engineer when it's making its decisions. So let's back up a little bit. Yes, it's a big house. It's a very big house. So in the beginning, AIG, when it went out to adjust its claim, it hired a company called H&A, which was its engineer. It hired JS Health, which is a building contractor. It also hired an industrial hygienist to talk about mold and other environmental concerns. During the course of the process, AIG relied on those experts at every turn. Now, Lief Eklund for AIG testified at trial, and he told the jury in detail what information he got, when he got it, and why he made the decisions he made. In every instance, supported by a letter to the plaintiff's counsel explaining his decision-making process. Every time. The jury heard that. What else did the jury hear? The jury heard detailed testimony from Richard Hard, AIG's engineer from H&A. Richard Hard testified about what he saw at the property. He showed the jury photos. He explained the damage. He explained what damage he did not think was relevant or should have been included. The jury heard that. The jury also heard testimony from Heath Bloomberg of JS Health. Mr. Bloomberg, the building consultant that AIG relied on, testified about the work that he did. He showed the jury photographs. He said what information he gave to AIG. He bolstered Lief Eklund's decision-making process. The jury heard all of this evidence. What did the jury not hear? The jury did not hear from ATA, the plaintiff's expert, the plaintiff's appraiser, who gave the $6.7 million estimate that we're here to decide, the jury was to decide whether AIG had to pay that on the spot or could it contest it with its engineer. They didn't call anyone from that company, no witness. A big part of this dispute was over the roof and what it would cost to replace that roof. The plaintiff did not call their roofing expert. They did not call anyone from Precision. On the flip side of that, AIG presented to the jury again in detail what it did to value the roof, what J.S. Howell did, what Lief Eklund himself did in terms of going out and doing research about the condom tile that was there because the policy only required replacement with like, kind, and quality. And what was being offered on the other side was not like, kind, and quality. It was a Rolls Royce. It was Ludovici tile, which is not what was on the house, at a cost of $10,000 per square. Instead, what AIG wanted to pay was based on its research going to the manufacturer of the tile that was already on the house to get a price from them for that. So that's where AIG is coming from. So what the jury's focused on is that point in time. So what the appraiser's amount is not relevant to what Lief Eklund is deciding when he's making the decision to invoke the appraisal. And let's talk about the appraisal for one second. The policy provision for the appraisal is copied in the plaintiff's brief. And it requires both sides to acknowledge that there's a dispute. So when you invoke the appraisal process and you willingly participate, you're acknowledging that the amounts are in dispute. So we know that. That's important. The other thing about the appraisal process, you asked, Judge, whether AIG had to pay it. Was it banned? And the answer is actually no, it was not. AIG could have contested the appraisal amount. But as Lief Eklund explained to the jury, it chose not to. And it told the jury why they didn't. It's because AIG itself invoked that process and they were determined to stand behind it. So they stood behind it, paid that amount, whether they agreed with it or not. But again, what was that? Now, wait a minute. The man that the appraisal witness was able to say that it paid it even though it had invoked it or something, why was that allowed at trial if the judge wouldn't allow the appraisal amount or testimony by the appraiser in evidence? There was no objection, Your Honor, to any testimony about the payment having been made. Just not the amount. So the only objection about, so the umpire herself testified. So she testified all about the appraisal process. She was there. She was the plaintiff's witness. So she testified about the process. She testified about what she considered, what she saw, what damage there was, anything so that the plaintiffs could say, you know, they saw more. They saw more damage than what ATA saw. And so you should have paid the ATA estimate. All of that went in. It's just the number didn't go in because the judge had limited the scope to the $5.5 million delta between the other two numbers. So he said that number shouldn't go in. But again, even the umpire supported AIG's position. And she did so this way. She was admitted as an expert in appraising and adjusting. And she said a reasonable appraiser should be allowed to hire an engineer, should be hired to get a building consultant, get that information in, and then should mull over that information in the context of the limits of the policy, which is what AIG did. Lou Gerwin, he also, his efforts supported AIG's reasonableness in this way. When Lou Gerwin, their appraiser, got involved, he took 12 or 13 people out to the house site. He went there three times for inspections. It took six months to get his appraisal report to the umpire. He hired two engineers. He hired an environmental specialist. And he hired a construction expert, just like what AIG had done. AIG took all those same steps for it to come to its conclusions about what it should pay. And so the AIG padding was reinforced by both of these experts. Let's talk about Lou Gerwin and what the complaint is. At first, the original brief by the plaintiffs complains that Lou Gerwin didn't get to say that he observed more damage than the ATA report. But then we pointed out in our brief not so, and we cited the court to the exact testimony where Lou Gerwin testified that he saw quite a bit more damage than what was in the ATA report. He was allowed to testify for a very long time, showing pictures of damage, compared what he found to what ATA found. And he was able to testify that he found all of the damage that ATA found. That all came in, all of that. What didn't come in was the amount. And frankly, when the court looks at the objections to our trial, you're going to see that the plaintiffs did not ask for that. In fact, instead, when you look at the objections made during trial, plaintiffs' counsel said he only wanted one question. He wanted to ask whether there was, of Erwin observed more damage. That's what he told the district court judge. That's what I want to ask. He had already asked it. When he asked it again in a proffer, it's the same testimony. Let's suppose, just for purposes of argument, that we disagreed with you on the 401 relevance question as to the excluded evidence. What is your argument that you should still prevail? Yes, Your Honor. So if the court finds that the evidence was relevant, the district court was still correct in excluding the evidence on a 403 balancing test. As the court knows, the review, standard of review, is clear abuse of discretion on 403. The district court didn't just find that the evidence would be prejudicial. He found more. He found that it would also be confusing and it would mislead the jury. Again, the reasons for that go back to what was at issue in the case, the difference between the JS held estimate and the KTA estimate. But beyond showing a big number, what specifically made that appraisal award unfairly prejudicial or confusing to a jury that would have heard, I suppose, some limiting instruction? Well, Your Honor, because the question was not whether AIG should have paid the full appraisal amount, and that's because of the way the summary judgment ruling was made, and the plaintiffs have not challenged that ruling here. What the judge held in summary judgment was the only thing at issue for trial was a portion of the fifth payment, the portion being the difference between those two estimates, 5.5, whether AIG timely paid 5.5, not 13. And so it's prejudicial not just because it's inflammatory, but because it's not the amount that was at issue in the case. And that's not what the jury saw even on its verdict form. The jury answered question number one, which was a fact question, and it found that all payments were made within 30 days of satisfactory proof of loss. It never moved to arbitrary and capricious. But if you look down at that next question, the five payments at issue are listed, and number five is only the difference between JS Health and ATA, $5 million, not the full appraisal amount. There's no question that AIG paid the full appraisal amount on time. The only question before the court was whether it was reasonable for AIG not to have paid the ATA estimate before it invoked the appraisal process. That's why. So it's pivotal that the focus is on what AIG knew when it made its decision not to pay the ATA estimate, but instead to invoke the appraisal process. And that's at the very heart of the evidence rulings and why the judge was corrupt. There's no sufficiency of the evidence challenge. There's been no challenge that the jury's decision on question number one was not supported by ample evidence. And, in fact, it was. It was supported by a host of evidence, not just the evidence testimony, but it was also supported. Well, that's irrelevant to the evidentiary issues, isn't it? They're not challenging the correctness of the jury verdict. In a sense, they're just saying we should have been allowed to put this evidence in there. We should have been allowed to introduce this evidence. But, Your Honor, I think it does dovetail with the second part of the evidence analysis. One is whether the trial court erred, and the second is whether there was substantial injustice caused by the omission of the evidence. And if the evidence is either merely cumulative or pales in comparison to the rest of the evidence that was admitted, then the plaintiffs don't meet the second part of the test for getting a new trial based on an evidentiary ruling. And, in this case, they can't show that there was a substantial prejudice because, again, the evidence was so overwhelming in favor of AIG. And that takes me, Judge, to the one sentence taken from the closing argument. And the court asked whether there was an objection. The answer is no, there was not an objection. There was not a bench conference. There was not any argument to the district court that that opened the door in any way or there should have been a curative instruction. It simply was not there. So we're taking two evidence rulings out of the context of what was a very involved trial. And in the context of the very involved trial, they are insignificant. They don't do substantial injustice. The district court was first correct, and then, if not correct, they still can't meet that second part of the test. And that's why, Judge, I do think it matters how much evidence was presented that, in fact, supports the jury's verdict. So the jury, correct me if I'm wrong, the jury found against the other side on the first two elements of Louisiana bad faith, on satisfactory proof of loss and on the 30-day delay. Is that correct? They were wrapped into the first question, Judge. So the jury never reached the issue of arbitrariness and excluding evidence that's really probative of arbitrariness couldn't have altered the verdict. Is that right? Precisely. And, in fact, when you read the plaintiff's brief, both of them, you will see it speaks in terms of arbitrary and capriciousness, that these numbers would have shown AIJ to be arbitrary and capricious. But as we say in our brief, that's not the question that was asked. It was whether the plaintiff had proved by a preponderance of the evidence that any payment by AIJ was made more than 30 days after satisfactory proof of loss. And, again, Judge Willett, you narrowed in on it. The answer to that question was no. No payment was late. You don't move to arbitrary and capricious unless you get late first. No payment was late. So these two pieces of evidence, again, not relevant but also not pivotal, they don't do substantial injustice. I see my time is almost up. So unless the court has any questions, we just ask that the court affirm the jury's well-reasoned decision. Thank you. Michelle, thank you very much. Mr. Burge, you're back for five minutes. I guess I do have a question. If the jury never reached arbitrariness, then how could the exclusion have affected substantial rights? Well, to your point, I don't think this evidence is only relevant to arbitrariness. I think it is directly relevant to substantial proof. And the reason for that is because what these people did during the appraisal process to conclude that this was a $16 million claim is they had access to all the same things AIG had access to in the six months before the appraisal. They were able to do a full inspection of the property. They were able to hire engineers. They were able to hire building consultants. And how is it that the appraisal process comes up with a $16 million claim, and yet AIG, as the insurer, who has an affirmative duty to properly adjust the claim and pay a reasonable amount, about which reasonable minds could not differ, only came up with $1.3 million worth of claims here? That's certainly evidence a jury can consider in whether AIG, who had access to all the same things Lou Gerwin had access to, they can hire engineers and everything else, should have found more than $1.3 million worth of damages by January 4th, and then 30 days go by before they even asked for the appraisal at that point. And I think Judge Barksdale hit on an important point about the sort of fairness of this trial. AIG was allowed to stand up and say, we paid every amount that was due under the appraisal, but we weren't allowed to talk about the amount they paid. It presents a very uneven picture of this case to the jury because they never learn about the true scope of this claim, the true scope of the damages to this property. And it's true, there was lots of testimony from Mr. Irwin about everything that was visible, but he wasn't allowed to testify that what was visible was a lot more than $6 million worth of damages. He wasn't allowed to say anything about any number higher than $6 million, even though the appraisal came back at 16. Let me ask you this. So the jury found no 30-day delay. So I wonder how would evidence, given that they found no 30-day delay, how would evidence about the size of the appraisal award have changed that finding or had really any effect? To be clear, I think the only reasonable way to interpret the jury's rule is they found no satisfactory proof of loss. There's no question there was a 30-day delay, right? The demand comes in November. They don't pay it until the following November. There's a year delay. They must have found that the proof of loss given by ATA was not a satisfactory proof of loss because the days of delay is a, you know, that's a fact everybody could stipulate to. They must have found that the proofs of loss given prior to the appraisal were not a satisfactory proof of loss in the Louisiana statute. Therefore, there was no 30-day delay because there was never satisfactory proof of loss. I'd submit the size of the final award can speak to the satisfactory proof of loss because what the people are looking at during the appraisal process is the same thing AIG is looking at. And I think a reasonable jury could say, how is it that these appraisers and these umpires looked at this property and found $16 million worth of damage and yet AIG looked at the same property and found $1.3 million worth of damage? What would be an example of relevant evidence that is unfairly prejudicial? What would that look like in this case? Well, I mean, let's say, well, I don't think the amount of the final award could be unfairly prejudicial in any situation. But let's say there was evidence that, you know, AIG had made a phone call and had talked to somebody and that person had said that we think the proper, you know, the proper tile should be $10,000 a square foot. And AIG said, that's not reasonable. I'm going to ignore that. And they talked to somebody else and that person said it should be $1,000 a square foot. I think for us to just put in, when they talk to somebody who said $10,000 a square foot, that might be unfairly prejudicial. But what we're talking about here is the final award made under the appraisal policy in the contract. There's nothing unfairly prejudicial about that. It's the actual amount AIG paid. It is the facts on the ground. It's not just some random fact that came out during the appraisal process. It's not some engineer's, you know, top of the head thought about what, you know, what might be the right number. It's the actual value of this claim. And I think, actually, that first Pentecostal church mutual case that you wrote a year ago, I think it's interesting the distinction between that case and this case. In that case, they hired an engineer. They worked back and forth with the engineer for months. And they paid 14 days after they got the engineer's final report an amount that was the proper amount to pay. Therefore, no bad faith. Here, they worked with an appraiser for six months. They got the appraiser's number. And then they didn't do anything for 40 days. And then 40 days later, they invoked this appraisal process that shows a much larger number. That's a completely different set of facts than that first Pentecostal case. And I'd submit each of these bad faith liability cases, for better or worse, they're extremely fact-dependent. And here, a critical fact is kept. OK. Thank you. Mr. Bursch, thank you. We appreciate the argument from both sides. The court will stand in recess until tomorrow morning. And as we do, we will stand in recess.